DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Leslie N., ("Mother") appeals from the judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her four children, J.H., S.H., R.H., and L.N., and placed them in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.
 I. *Page 2 {¶ 2} In April 2004, Mother resided with Anthony H. and three children: J.H., born October 22, 1996; S.H., born February 22, 2001; and R.H., born November 17, 2003. Anthony H. was the father of J.H. and R.H. Two other men were alleged to have fathered S.H. and later born L.N. None of the fathers or alleged fathers is a party to the present appeal.
 {¶ 3} LCCS initially became involved with the family at that time, based on claims of domestic violence, specifically that Anthony H. was hitting J.H. and had set Mother's car on fire. The agency proceeded to interview family members and school personnel in order to determine whether to open a court case. Then, on May 4, 2004, Anthony H. created a hostage situation involving two of the children. On that day, Mother, the maternal grandmother, and the LCCS caseworker approached the home where Anthony H. held S.H. and R.H. Anthony H. refused to allow them to enter and fired a gun out the window. The maternal grandmother was struck by a bullet and Mother injured her foot while attempting to get away. Police were called and the children were held hostage for more than 24 hours. When the matter was resolved, Mother was briefly hospitalized for an emotional collapse triggered by the stand-off. Anthony H. was arrested, convicted, and sentenced to a prison term of 15 years. The three children stayed with their maternal grandmother until Mother was released from the hospital. Upon Mother's release from the hospital, the agency assisted Mother by paying the security deposit and one month's rent on a home. *Page 3 
 {¶ 4} On August 5, 2004, the agency filed complaints in juvenile court, alleging that the three children were neglected and dependent, and seeking a grant of temporary custody and placement with the paternal grandmother. LCCS was concerned with Mother's ability to provide for the basic needs of her children. The concerns stemmed from Mother being evicted from her home, the poor hygiene of the children, three-year-old S.H. being found walking down the street alone, and J.H. having problems in school, including making sexual remarks and exhibiting extreme behavior. LCCS believed that Mother left the children with inappropriate caregivers and that the children were often placed in dangerous situations. In addition, the agency was concerned that Mother was not properly addressing her own mental health issues.
 {¶ 5} Following adjudicatory and dispositional hearings, the trial court found the three children to be neglected and granted temporary custody to the agency. The case plan required the family to address domestic violence issues and issues stemming from the hostage situation. The case plan also required Mother to obtain and document a stable income; address mental health issues; obtain a substance abuse assessment and follow recommendations; attend parenting classes; participate in the planning process for the children's educational and special educational programs; meet the regular and special medical needs of the children including food, clothing, and shelter; provide for adequate supervision of *Page 4 
the children; and provide names of relatives who might be able to care for the children.[1]
 {¶ 6} On June 23 2005, LCCS filed a new complaint, alleging that the youngest child, L.N., born April 22, 2005, was neglected and dependent and seeking a grant of temporary custody to LCCS. In due course, L.N. was adjudicated dependent and was placed in the temporary custody of the agency. She was placed with a foster family.
 {¶ 7} On January 12, 2006, LCCS moved for permanent custody of all four children. Following a hearing, the trial court terminated the parental rights of Mother as well as the parental rights of all fathers or alleged fathers and granted permanent custody of the children to LCCS. The trial court found that the children could not be placed with either parent within a reasonable time or should not be placed with a parent and that it was in the best interest of the children to be *Page 5 
placed in the permanent custody of LCCS. Mother has appealed and has assigned one error for review.
 II. ASSIGNMENT OF ERROR "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND IN VIOLATION OF O.R.C. 2151.414, THE FOURTEENTH AND NINTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 1 OF THE OHIO CONSTITUTION, WHEN IT TERMINATED THE PARENTAL RIGHTS OF APPELLANT AND GRANTED PERMANENT CUSTODY OF THE MINOR CHILDREN TO LORAIN COUNTY CHILDREN SERVICES, WHERE THE EVIDENCE FAILED TO SATISFY THE REQUISITE STANDARD OF PROOF."
 {¶ 8} Mother contends that the trial court erred in terminating her parental rights because the agency failed to meet its burden of proof by clear and convincing evidence.
 {¶ 9} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an *Page 6 
analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95,99.
 {¶ 10} The trial court found that the first prong of the test was satisfied because the children could not be returned to Mother within a reasonable period of time and should not be returned to her care, and also found that it was in the best interest of the children to be placed in the permanent custody of LCCS. Mother challenges both findings as being unsupported by the weight of the evidence and contrary to law.
 {¶ 11} The manifest weight of the evidence standard to be applied in civil cases is that standard which was explained in C.E. Morris Co. v.Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. See State v.Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 24. Pursuant to this standard, a reviewing court will presume that the findings of the trier of fact are correct since the trial judge had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id., quoting Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Wilson, 113 Ohio St.3d at ¶ 24, quotingSeasons Coal, 10 Ohio St.3d at 81. *Page 7 
"Thus, a judgment supported by `some competent, credible evidence going to all the essential elements of the case' must be affirmed."Wilson, 113 Ohio St.3d at ¶ 26.
 {¶ 12} Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in a permanent custody case, this Court must determine whether the judgment of the trier of fact was supported by some competent, credible evidence going to all the essential elements of the case. If the judgment is so supported, then the judgment of the trial court must be affirmed.
 {¶ 13} Mother challenges the finding that the children could not be returned to her within a reasonable time or should not be returned to her, in three regards: (1) Mother's housing situation; (2) hearsay statements by J.H. about an incident occurring at the Callicoat home, and (3) Mother's psychological evaluation.
 {¶ 14} First, Mother claims that if her children were returned to her, she would be able to secure suitable housing. The trial court relied upon the following facts in reaching an opposite conclusion. After Anthony H. was arrested in May 2004, the agency provided services to Mother to assist her in caring for the children in that home. They paid the security deposit and the first month's rent. Mother was unable to maintain the home and was soon evicted. Mother then went to live with her own mother. *Page 8 
 {¶ 15} From April 2005 to June 2005, while the three older children were in foster care, Mother and newborn L.N. resided with friends of Mother, the Callicoat family.[2] LCCS was willing to create a permanency plan involving the Callicoats, and increased the family's visitation and overnight visits in order to build to that goal. The plan collapsed, however, after Mother was believed by the agency to have threatened to harm herself in the presence of J.H. The Callicoats were no longer willing to have Mother or her children in their home because of safety concerns, including the fact that Mother's male friends frightened them. Mother returned to live with her own mother again. Service providers assisted Mother in searching for housing, but she rejected all available options.
 {¶ 16} Mother moved to the Journey Inn in November or December 2005 and later moved to an apartment at the Harr Plaza with her fiancé, Ron Brown. Mother and Mr. Brown had known each other for six months and were engaged after three months. Mr. Brown is unemployed, receives supplemental security income, has met Mother's children only once for 15 minutes, and has a criminal record for assault. The Harr Plaza, where they currently reside, does not permit children. Mother and Mr. Brown were on a waiting list for housing through the *Page 9 
Lorain Metropolitan Housing Authority ("LMHA"). Mother had a delinquent account with LMHA which made her ineligible for housing in her own name at the time. Mother claimed she was paying off that debt.
 {¶ 17} In light of this history, Mother's bald assertion that she would be able to secure and maintain suitable housing if the children were returned to her, fails to overcome the evidence before the trial court. The fact remains that after nearly two years Mother still cannot offer the children a safe, stable home.
 {¶ 18} Second, Mother claims that the trial court should not have relied on hearsay statements by nine-year-old J.H. while at the Callicoat's home, statements in which J.H. claimed Mother threatened her own life. Later in her appellate brief, Mother challenges additional statements by J.H. as hearsay, statements to the foster mother and to the caseworker that Mother frightened him when she screamed at him and pounded on the car dashboard. Neither of these statements was challenged by an objection. Absent objection, any error is forfeited and need not be addressed on appeal. In re D. W., 8th Dist. No. 84547,2005-Ohio-1867, at ¶ 26, citing Stores Realty Co. v. Cleveland (1975),41 Ohio St.2d 41, 43.
 {¶ 19} Third, Mother challenges the trial court's reliance upon a portion of the testimony of psychologist Dr. Thomas Zeck. The challenged matter appears to be Dr. Zeck's statement that Mother resented the assistance of service providers and that Mother believed she did not need help with parenting. Mother's counsel argues on appeal that it is not unreasonable for a parent to resent the intrusion of *Page 10 
others and to believe that he or she is a good parent even when the parent actually is not.
 {¶ 20} A review of the record reveals that these children had problems with attention deficit disorder, stealing, speech, and inappropriate behavior, including temper tantrums and improper sexual comments. In light of this, Dr. Zeck explained that Mother needed to acknowledge reality and ask for help. Moreover, Dr. Zeck explained that his testing of Mother revealed a "significant pathological need to present a good front" and demonstrated defiance and an unwillingness to admit to problems she may be having. Upon pointed questioning by the trial judge, Dr. Zeck confirmed that Mother's minimization of problems was "beyond the normal range" of parents that wished simply to place their children in a good light.
 {¶ 21} On the basis of the record and the arguments made by Mother's counsel, this Court does not find that Mother has demonstrated any error in the conclusions of the trial court as to the testimony of Dr. Zeck.
 {¶ 22} In addition, Mother argues that R.C. 2151.414(B)(1)(d), the 12-of-22 provision, is unconstitutional and that the trial court's reliance on that provision was against the weight of the evidence. R.C.2151.414(B)(1)(d) is only one of four possible alternative findings on the first prong of the permanent custody test. See R.C. 2151.414(B)(1). The trial court did not rely upon R.C. *Page 11 2151.414(B)(1)(d) as a basis for its finding on the first prong of the permanent custody test. Consequently, there is no prejudice to Mother and no basis for error.
 {¶ 23} Mother also claims that the trial court erred when it found that it was in the children's best interest that permanent custody be granted to the agency. The second prong of the permanent custody test requires a determination of whether a grant of permanent custody is in the children's best interest. In so doing, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 "(5) Whether any of the factors in divisions (E) (7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5).
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. *Page 12 
See In re Smith (Jan. 2, 2000), 9th Dist. No. 20711; see, also, In rePalladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 24} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quotingCross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 25} Mother complains that the trial court did not explicitly refer to the best interest factors in its decision. However, the statute does not require the trial court to make findings on each of the factors, it only requires the trial court to "consider" the factors of R.C.2151.414(B)(1)(d). The decision of the trial court makes clear that it considered the statutory best interest factors and relied upon evidence in the record as to each of those factors.
 {¶ 26} In regard to the first best interest factor, Mother claims that the evidence demonstrates that she had a bond with her children and that her relationship with them was a good one. Mother also asserts that the children had relationships with other relatives, and that the children are "not thriving" in foster care. Mother has not pointed to any evidence in support of this claim. *Page 13 
 {¶ 27} Our review of the record reveals that Mother loves her children very much, but has not been able to keep them safe, has not demonstrated good parenting skills, and has been resistant to obtaining services. Visits between J.H. and Mother had to be terminated in January 2006 because they were upsetting to the child.
 {¶ 28} As to relationships with other relatives and friends, Anthony H, the father of J.H. and R.H., will be in prison for 15 years and the other two alleged fathers have no relationship with the children. The paternal great grandmother, who once had placement of the children, has not seen them since August 2004. The one positive relationship with friends, the Callicoats, was terminated as a result of Mother's outburst.
 {¶ 29} When the children initially came into care, J.H. had no social skills, exhibited behavioral outbursts, and suffered from nightmares and flashbacks. S.H. had terrible temper tantrums. The three oldest children all had speech problems and required counseling. According to the LCCS caseworker, Kathy Isner, and guardian ad litem, Gail Traxler, the children have made tremendous improvements since they have been in foster care and are very happy in their present foster homes. R.H. was having the most difficulty adjusting, but only because he was very accustomed to the former foster home.
 {¶ 30} Caseworker Isner testified that although Mother attended parenting and anger management classes, she was still concerned about Mother's ability to *Page 14 
follow through with skills she should have learned. Isner was also concerned about the people that Mother associated with, her tendency to blame the children for situations that she put herself into, her failure to accept responsibility for her own actions, and her unresolved mental health issues. Mother never established a stable living arrangement and often failed to follow through on visits and tutoring appointments. Isner did not believe that Mother would be able to provide the children with a safe, stable residence.
 {¶ 31} In response to the agency's position that Mother had not fully addressed her mental health objective, Mother offered evidence that she was being counseled by Bertha Noble. On cross-examination, it was established that Bertha Noble was a minister, that Mother met her while providing services as a home health aide, and that Noble had no formal training as a counselor.
 {¶ 32} Mary Jane Toney, an LCCS case aide, testified regarding her observations of Mother and the children during visitations and her involvement with the children. She testified that Mother had a difficult time trying to manage all the children during visitations and would get frustrated with them. She would become very loud with them and J.H. would then get upset. In January 2006, the case plan was amended to exclude J.H. from visits because they upset him so much. When that happened, Toney went beyond the usual duty of a case aide and took J.H., and sometimes his sister, S.H., to "biddy basketball," lunch, putt-putt or other activities. She did this because she wanted to help boost his morale. *Page 15 
 {¶ 33} In addition to these efforts by case aide Toney, the record in this case reveals some unusually dedicated efforts by LCCS to reunite the family. Unfortunately, none of them ended well for Mother. Early on, the agency sought the names of potential relative placements so as to limit the amount of time the children would have to be in foster care. The agency initially placed the three oldest children with the paternal grandmother and they remained there until the grandmother could no longer care for them. The agency attempted a creative reunification plan involving a placement with the Callicoat family in the spring of 2005, and that plan held promise until Mother created a disturbance in front of the children and was asked to leave by the family. In the fall of 2005, Mother was given an opportunity to have more contact and unsupervised visitation with her children along with the responsibility to transport the children to tutoring and speech therapy sessions. When Mother missed too many appointments, the agency was forced to cancel that arrangement. The first best interest factor does not weigh in favor of Mother.
 {¶ 34} As to the wishes of the children, the trial court found that nine-year-old J.H. had expressed an interest in not returning to his mother. Mother argues that the child's comment actually reflected a desire to avoid his father and not a desire to avoid his mother, but Mother has failed to support her argument on this point with any references to the record. Indeed, our review of the record corroborates the view that J.H. would not want to return home. Patty Verde, J.H.'s *Page 16 
therapist, testified that J.H.'s concerns about going home were specifically in reference to Mother and not a reaction to the shooting incident involving his father. Verde also testified that J.H. reported to her that Mother blamed him for LCCS's removal of the children. LCCS caseworker Isner testified to several occasions when J.H. was very upset or frightened by Mother's behavior — Mother telling J.H. she did not want to live any longer, screaming at J.H. while she was driving, and bringing men into their home while still living with his father. The guardian ad litem reported that Mother's visits with J.H. were stopped in January 2006 because of the emotional harm she caused him during visits. She cited Mother's verbally berating J.H. and blaming him for her problems with LCCS. Finally, and significantly, there is no evidence in the record affirmatively suggesting that J.H. ever expressed a desire to return home to live with Mother.
 {¶ 35} The custodial history of the children reveals that the three oldest children, ages 9, 5, and 2 1/2, had been out of Mother's care since the summer of 2004, nearly two years by the time of the permanent custody hearing. They were placed with their paternal grandmother for approximately three months and with two foster families for the remainder of the time. The youngest child spent two months with Mother and nearly one year with a foster family.
 {¶ 36} As to the fourth best interest factor, there was evidence before the trial court that the children were in need of a legally secure placement and that permanent custody would allow for that. There were no viable potential relative *Page 17 
custodians. The 77-year-old paternal great grandmother testified that she would like to have custody of the children, but would need the help of her family and such help did not seem to be forthcoming. In addition, this relative had not filed a motion for legal custody and had also previously told the caseworker that she did not want to be considered because of the needs of the children and the fact that they seemed quite happy in their foster placements.
 {¶ 37} According to the caseworker, the children were doing very well in foster care. The caseworker testified that she believed permanent custody was in the best interests of the children and is the only means to achieve a legally secure placement.
 {¶ 38} The guardian ad litem also recommended permanent custody and believed that would be in the children's best interest. L.N.'s foster parent was interested in adopting her and was willing to maintain contact with the siblings.
 {¶ 39} Upon review, the record demonstrates that there was competent, credible evidence before the trial court from which it could conclude that the children could not or should not be placed with a parent and that permanent custody was in the children's best interest. Consequently, the trial court did not err in terminating Mother's parental rights, and in placing J.H., S.H., R.H., and L.N. in the permanent custody of LCCS. Mother's sole assignment of error is overruled. *Page 18 
 III. {¶ 40} Mother's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 Costs taxed to appellant. *Page 19 
WHITMORE, P. J. DICKINSON, J., CONCUR.
[1] In her appellate brief, Mother complains that no case plan was submitted as an exhibit and that, therefore, the trial court had no evidence by which to gauge whether Mother complied with her case plan objectives. Several case plans were filed by the agency in the course of the proceedings below and became a part of the record of this case. The case plans that were adopted by the trial court became orders of the court. The fact that the case plans were not also admitted as exhibits is inconsequential.
[2] When Mother initiated the plan to stay with Callicoats, Mother told the caseworker that the Callicoats were relatives, but the caseworker later learned that the Callicoats were just friends. Nevertheless, because the family was very supportive and responsible, the agency sought to implement a reunification plan involving them. *Page 1